UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In Re: Application of ）
HERAEUS KULZER GmbH for an ）
Order Pursuant to 28 U.S.C. § 1782 ）
to Take Discovery Pursuant to the ）  CAUSE NO. 3:09-CV-530 RM
Federal Rules of Civil Procedure ）
for Use in Foreign Proceedings ）

OPINION and ORDER

Heraeus Kulzer GmbH has filed a motion to compel Biomet, Inc. and Biomet

Orthopedics, LLC to produce documents and related information Biomet withheld

from production based on a claim of attorney-client privilege. Heraeus says it

learned only recently of two documents Biomet listed on its privilege log that,

Heraeus says, demonstrate that Biomet "apparently enlisted its counsel's

assistance in its attempt to cover up its misdeeds and keep them from being

discovered by Heraeus." Heraeus maintains the crime-fraud exception to the

attorney-client privilege applies and provides support for its request that Biomet

produce the documents from the privilege log. Alternatively, Heraeus asks that the

court conduct an in camera review of the documents to decide whether the

documents should be produced. Biomet and intervenor Esschem have filed

objections to Heraeus' motion.

*Crime-Fraud Exception*

Heraeus argues that the crime-fraud exception to the attorney client privilege is applicable. "The crime-fraud exception places communications made in furtherance of a crime or fraud outside the attorney-client privilege." United States v. BDO Seidman, LLP, 492 F.3d 806, 818 (7th Cir. 2007). "The exception's purpose is to ensure that the confidentiality afforded to communications between attorney and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." Shaffer v. American Medical Ass'n, 662 F.3d 439, 447 (7th Cir. 2011). To prevail, Heraeus must "present prima facie evidence that gives color to the charge by showing some foundation in fact," and Biomet may then "come forward with an explanation for the evidence offered against the privilege." United States v. Boender, 649 F.3d 650, 655 (7th Cir. 2011) (internal quotations and citations omitted). The court must exercise its discretion "in accepting or rejecting the proffered explanation, [and] may, if necessary, examine the privileged communications themselves to determine whether they further a crime or fraud." United States v. Boender, 649 F.3d at 656; *see also* Miyano Machinery USA, Inc. v. MiyanoHitec Machinery, Inc., 257 F.R.D. 456, 462 (N.D. Ill. 2008) ("The Seventh Circuit has held that a prima facie showing of fraud does not require evidence sufficient to support a verdict but, rather, enough evidence to require the party in the best position to explain things, to come forward with that explanation. The privilege will remain if the district court finds the explanation satisfactory.").

"[A] party seeking to invoke the crime-fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." Mattenson v. Baxter Healthcare Corp., 438 F.3d 763, 769 (7th Cir. 2006) (*quoting* In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995)). "To satisfy the 'in furtherance of' element of the crime-fraud exception, a logical link must exist between the privileged communication and the proposed crime or fraud. That is, the legal advice must relate to future illicit conduct by the client; it must be the causa pro causa, the advice that leads to the deed. Further, it does not suffice that the communications may be related to a crime; they must actually have been made with an intent to further an unlawful act." In re Neurontin Antitrust Litigation, 801 F. Supp. 2d 304, 309-310 (D.N.J. 2011) (internal quotations and citations omitted). "The moving party need not make a specific showing of the client's intent in consulting the attorney, but the evidence must support the inference that the attorney's representation or advice assisted the client in committing the alleged offense." Nobelpharma Ab v. Implant Innovations, Inc., 930 F. Supp. 1241, 1261 (N.D. Ill. 1996).

"[A] lesser evidentiary showing is needed to trigger in camera review than is required to ultimately overcome the privilege. . . . The court should make [the] decision [about whether to engage in an in camera review] in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance

3

to the case of the alleged privileged information, and the likelihood that the

evidence produced through in camera review, together with other available

evidence then before the court, will establish that the crime-fraud exception does

apply." United States v. Zolin, 491 U.S. 554, 572 (1989).

*Applicability/Extension of Exception*

Biomet first argues that the crime-fraud exception doesn't extend to an

ordinary tort case like this, and the exception should, instead, be limited to cases

where an attorney facilitates a crime or a fraud. The "unsettled and developing

nature of the law" relating to what types of alleged conduct fall within the crime-

fraud exception was examined in Koch v. Specialized Care Servs., Inc., 437 F.

Supp. 2d 362 (D.Md. 2005). The court first noted the following language from

RESTATEMENT (THIRD) LAW GOVERNING LAW § 82 cmt. d:

> The evidence codes and judicial decisions are divided on the
> questions of extending the exception to other wrongs such as
> intentional torts, which, although not criminal or fraudulent, have
> hallmarks of clear illegality and the threat of serious harm.
> Legislatures and courts classify illegal acts as crimes and frauds for
> purposes and policies different from those defining the scope of the
> privilege. Thus, limiting the exception to crimes and frauds produces
> an exception narrower than principle and policy would otherwise
> indicate. Nonetheless, the prevailing view limits the exception to
> crimes and frauds. The actual instances in which a broader exception
> might apply are probably few and isolated, and it would be difficult
> to formulate a broader exception that is not objectionably vague.

437 F. Supp. 2d at 375. The Koch court interpreted the Restatement as "not

outrightly" rejecting the expansion of the exception "outside the traditional notions

of crime or fraud," but, rather, as recognizing that while a blanket expansion couldn't be "easily codified into language suitable for purposes of the Restatement," specific expansions could be proper "on a factual, case-by-case basis." 437 F. Supp. 2d at 375.

The Koch court noted, too, that "[a] survey of case law demonstrates judicial willingness to expand the exception to the kind of conduct alleged here [*i.e.*, tortious interference with contract]." 437 F. Supp. 2d at 376 (citing cases). The Koch court ultimately concluded that "the policies underlying the attorney-client privilege would not support the protection of communications in furtherance of 'the injurious conduct or fraud' alleged by the plaintiffs." 437 F. Supp. 2d at 376; *see also* Blanchard v. EdgeMark Fin. Corp., 192 F.R.D. 233, 241 (N.D. Ill. 2000) ("[T]he term 'crime-fraud' is a bit of a misnomer, as it is clear that many courts have recognized other situations in which the exception might apply." (citing cases)); Cleveland Hair Clinic, Inc. v. Puig, 968 F. Supp. 1227, 1241 (N.D. Ill. 1996) (applying crime-fraud exception to counsel's sanctionable misconduct under Rules 11 and 37); 1100 West, LLC v. Red Spot Paint and Varnish Co., Inc., No. 1:05-cv-1670, 2009 WL 232060, at *5 (S.D. Ind. Jan. 30, 2009) (applying crime-fraud exception to circumstances where 1100 West "provided prima facie evidence that Red Spot purposefully concealed relevant documents during discovery").

No party in this case has alleged that the crime-fraud exception applies because a crime was committed, but Heraeus' claims against Biomet could be viewed as allegations that Biomet committed a fraud by concealing relevant

documents. The court concludes, contrary to Biomet's argument, that extending the crime-fraud exception to the circumstances present here is justified.

*Discussion*

Heraeus maintains the record shows that Daniel Smith (the Biomet employee in charge of developing Biomet's bone cements) and Dr. Rainer Specht (Biomet's European scientist who, having previously worked for Merck, had direct access to Heraeus' confidential information) each acknowledged that they were trying to make Heraeus' trade secrets available to Esschem to assist Esschem in developing a bone cement for Biomet. Heraeus points to

– A March 11, 2004 letter from Dan Smith to Esschem, asking Esschem to develop two copolymers, specifying that the "chemical formulation of the polymer powders must be nominally identical, and the morphology very similar to the polymeric components of [Heraeus'] Palacos R Bone Cement. The cement made using these polymer powders should mirror Palacos in both handling and mechanical properties. The combination of publically available information and laboratory analysis of currently-marketed cements should provide you with a good starting point for development of processes to produce these polymer powders. . . . Within a few days I will be sending several units of Palacos R from various distributors (Schering-Plough, Richard's, and Biomet) and several units of Osteopal Bone Cement." Heraeus Exh. A.

6

– An April 29, 2004 e-mail from Dr. Specht to Mr. Smith: forwarding a recipe for the new Biomet bone cement, which he referred to as "our Palacos-me-too product." Heraeus Exh. B, p. 1366.

– A May 7, 2004 e-mail from Dr. Specht to Mr. Smith: "Attached for your information I send you an information I had received from Kulzer concerning the chlorophyll. Of course this is not public information." Heraeus Exh. B, p. 2981.

– A July 12, 2004 e-mail from Dr. Specht to Mr. Smith: "[A]ttached I have a description from Kulzer about the preparation of the chlorophyll for the cement and a clear description, in which form the chlorophyll is added to the powder and the liquid. I have to admit that at present I do not see a possibility how to get this information to Esschem. Do you have an idea?" Heraeus Exh. B, p. 2985.

Heraeus says documents it relies on also show that Biomet obtained Heraeus' confidential specifications for the copolymers Heraeus purchases from Rhom, which Biomet then used to evaluate the copolymers produced by Esschem, *see* Heraeus Exh. B, p. 2291, and that Dan Smith "scoured literature looking for snippets about chlorophyll that might be pieced together and provided to Esschem using Heraeus' confidential information as a roadmap." Heraeus Exh. B, p. 2982.

Heraeus says, too, that Mr. Smith's reference to "look[ing] the packet over with legal" in his February 17, 2004 e-mail to Dr. Specht was code for seeking legal advice about how Biomet could supply Esschem with Heraeus' trade secrets

for Esschem's use in developing a bone cement for Biomet without disclosing where the information came from:

> I am very pleased with the public information that you have identified. I think that with this information and samples of the 'target' cements, Esschem can proceed efficiently (I think you found the key piece of puzzle both in the Carlsson et al. paper and the Schering-Plough literature). . . . Finally, would you forward copies of the literature on your list and any additional instructions that you think would be appropriate to provide to Esschem. We will look the packet over with legal and upon agreement that its all OK, either you or I can forward the packet to Esschem.

Heraeus Exh. B, p. 3024.

Heraeus concludes that "the documents and testimony show that Dr. Specht possessed Heraeus' confidential information, Dr. Specht and Mr. Smith used that information to assist Esschem in producing copolymers for Biomet, and Biomet's lawyers were enlisted to assist Dr. Specht and Mr. Smith to accomplish this scheme." Memo., at 7. Heraeus asks the court to require Biomet to disclose the documents Biomet listed on its privilege log – Dan Smith's February 27, 2004 request for "legal advice regarding business relationship with Esschem," and Robert Ronk's October 22, 2004 request for "legal advice regarding business relationship with Esschem and development of bone cements" – under the crime-fraud exception to the attorney-client privilege because, according to Heraeus, those "allegedly privileged communications were made in preparation or furtherance of Biomet's illicit scheme to use Heraeus' trade secrets and confidential information and indeed to cover up that scheme." Memo., at 2. Heraeus says the "most plausible inference" to be drawn from the timing and

topics of those e-mails is that Messrs. Smith and Ronk were trying to get "assistance from Biomet's lawyers in furtherance of the plan to use Heraeus' trade secrets and confidential information in the creation of Biomet's competing bone cements. Indeed, it appears that Biomet's employees enlisted its counsel to assist it in covering up its misappropriation of Heraeus' trade secrets." Memo., at 12-13. Heraeus says at the very least the court should conduct an in camera examination of the documents to evaluate whether the crime-fraud exception applies.

Biomet responds that Heraeus hasn't pointed to "any actual fraudulent or criminal activity, much less any such activity furthered by the advice of counsel." Biomet admits it contacted Esschem to develop a bone cement product that would be similar to and able to compete with Heraeus' product, but in the process of working with Esschem in that development "Biomet was careful to not provide any confidential or nonpublic information to Esschem to assist in developing the copolymers." Resp., at 6. Dan Smith testified in his deposition that he was careful to forward only publically available information to Esschem and, in fact, didn't see any need to use information that wasn't publically available, especially since one of the public documents the parties relied on was a book written by Dr. K. Kuhn, a Heraeus employee, describing some of the properties of the components of Heraeus bone cements, and the product samples relied on were publically available polymers. Biomet maintains that "[w]ithin this framework of public information – and with its extensive industry experience – Esschem began developing the requested co-polymers." Resp., at 7, 15-16.

Biomet counters that the "most plausible inferences" to be drawn from Mr. Smith and Mr. Ronk having sought legal advice are, first, that they were seeking legal advice for legitimate purposes because Biomet's supply relationship with Esschem was new, the project with Esschem was important to Biomet, and numerous rules and regulations surround products like bone cements, and, second, in light of the litigious history between Heraeus and Biomet-related entities (over 15 foreign suits since 2005), Messrs. Smith and Ronk were seeking legal advice to protect the Biomet companies. According to Biomet, "there are any number of valid reasons Messrs. Smith and Ronk may have contacted their General Counsel. Heraeus has offered no proof that the contrary is true, and none exists." Resp., at 18.

Biomet maintains that Heraeus hasn't provided evidence that Biomet's counsel helped the company in misappropriating Heraeus' trade secrets, nor has Heraeus presented a factual basis "adequate to support a good faith belief by a reasonable party that in camera review of the materials may reveal evidence to establish that the claim that the crime-fraud exception applies." Resp., at 18-19. Biomet concludes that it is willing to provide "the documents and witness declarations explaining the communications and the circumstances surrounding them" for the court's review if asked to do so. Resp., at 20.

Intervenor Esschem indicated in its response to Heraeus' motion that while Esschem "takes no position on the validity of Biomet's privilege claim since the two documents that are the subjects of [Heraeus'] motion do not implicate any

privilege belonging to Esschem," the company believes that Heraeus hasn't identified any evidence showing that Heraeus' confidential information was ever transmitted to Esschem or that Esschem needed any such information to develop copolymers for Biomet. Esschem represents that it "developed the copolymers at issue through experimentation and chemical analysis using Esschem's own confidential formulas, processes, equipment, and know-how that Esschem had developed over those years." Esschem concludes that "[t]o the extent the relief sought by Heraeus is premised on the argument that Biomet used confidential trade secrets it had misappropriated from Heraeus to guide Esschem's development efforts, that relief should be denied."

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law. . . . The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection – the centrality of open client and attorney communication to the proper functioning of our adversary system of justice – 'ceas[es] to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing,* but to *future wrongdoing.*'" United States v. Zolin, 491 U.S. 554, 562-563 (1989) (*quoting* 8 J. WIGMORE, EVIDENCE § 2298, p. 573 (McNaughton rev. 1961) (emphasis in original)). "The party seeking to abrogate the privilege meets its burden by bringing forth sufficient evidence to justify the [] court in requiring the proponent of the privilege to come forward with an explanation for the evidence offered against it. The privilege will remain if the [] court finds that explanation

satisfactory." United States v. BDO Seidman, LLP, 492 F.3d 806, 818-819 (7th Cir. 2007).

Heraeus claims the evidence establishes that Biomet's attorneys aided Biomet employees in supplying Esschem with Heraeus' trade secrets so Esschem could develop a competing bone cement, but the court can't agree. That two Biomet employees sought legal advice from Biomet's counsel relating to Biomet's "business relationship with Esschem" doesn't "establish," as Heraeus summarily concludes, that those employees were "enlisting counsel's assistance to cover up [their] misdeeds." Heraeus maintains the evidence also establishes that Biomet "handpicked publicly available references to create a road map for Esschem to follow based on [Heraeus'] trade secrets" and then used Heraeus' trade secrets to evaluate Esschem's copolymers, but review and use of public documents isn't a crime and doesn't amount to fraudulent conduct. Heraeus labels e-mails between Biomet employees as "self-serving letters designed to create the appearance that Esschem developed the copolymers independently," but Biomet has countered that claim with deposition and affidavit testimony from Dan Smith that Biomet employees who were working with Esschem took care to not supply Esschem with Heraeus' trade secrets. Too, Esschem independently insists that it had the experience and know-how to develop the requested bone cement products on its own without needing or receiving any help from Heraeus' confidential information.

"To invoke the crime-fraud exception, a party challenging the attorney-client privilege must make a prima facie showing that the communication was made 'in

furtherance of' a crime or fraud." <u>Abbott Labs. v. Andrx Pharmaceuticals, Inc.</u>, 241

F.R.D. 480, 487 (N.D. Ill. 2007). The evidence "must support the inference that the

attorney's representation or advice assisted the client in committing the alleged

offense." <u>Sound Video Unlimited, Inc. v. Video Shack, Inc.</u>, 661 F. Supp. 1482,

1486 (N.D. Ill. 1987). The evidence upon which Heraeus relies doesn't rise to the

level of a prima facie showing or support an inference that Biomet employees

sought legal advice and conspired with counsel to further a scheme to use

Heraeus' trade secrets. Even if the court were to find Heraeus' conclusion

plausible – that Biomet employees sought legal advice about how to successfully

use Heraeus' trade secrets without detection – Biomet's alternative explanation is

equally plausible – that Biomet employees sought legal advice relating to the

company's new relationship with Esschem and how to properly conduct that

business.


*Conclusion*

The attorney-client privilege "remains intact when a person consults an

attorney in an effort to receive legal advice or assistance." <u>Stopka v. Alliance of</u>

<u>American Insurers</u>, No. 95 C 7487, 1996 WL 204324, at *9 (N.D. Ill. Apr. 25,

1996). In fact,

> The attorney-client privilege is strongest when a client seeks advice to determine the legality of conduct before taking action. Business entities, like the defendants, operating in today's labyrinthine legal and regulatory environments, routinely seek legal advice about how to deal with all sorts of matters . . . . There is

nothing inherently suspicious about the officers of a corporation seeking such advice, and the attorney-client privilege exists to promote and protect those kinds of endeavors.

In re Sulfuric Acid Antitrust Litigation, 235 F.R.D. 407, 424-425 (N.D. Ill. 2006) (internal citations omitted).

Consideration of the arguments presented by all parties convinces the court that Heraeus hasn't made a showing of probable cause sufficient to support an inference that a fraud was committed and that Biomet employees enlisted counsel to further that fraud, especially in light of the explanations offered by Biomet and Esschem that those companies took steps to not use Heraeus' trade secrets. The court concludes that application of the crime-fraud exception isn't warranted and, so, DENIES Heraeus' motion to compel [docket # 124].

SO ORDERED.

ENTERED:    April 26, 2012

    /s/ Robert L. Miller, Jr.
Judge, United States District Court